IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COLLEEN M. FAURE,          :
   Plaintiff              :          CIVIL ACTION
                                :
   v.                     :
                                  :
MICHAEL J. ASTRUE,         :          No. 11-7736
Commissioner of the        :
Social Security Administration,  :
   Defendant              :
                                  :

**REPORT AND RECOMMENDATION**

TIMOTHY R. RICE                                        August 16, 2012
U.S. MAGISTRATE JUDGE

     Colleen Faure seeks judicial review of the Administrative Law Judge's ("ALJ") decision

denying her application for Disability Insurance Benefits ("DIB").  Faure alleges the ALJ's

decision was not supported by substantial evidence because the ALJ: (1) erroneously rejected the

opinion of Faure's treating physician in determining Faure's Residual Functional Capacity

("RFC");[1] and (2) improperly rejected Faure's testimony about her limitations.  See Plaintiff's

Brief and Statement of Issues in Support of Plaintiff's Request for Review at 5, 14, Faure v.

Astrue, No. 11-7736 (E.D. Pa. Apr. 30, 2012) [hereinafter Pl.'s Br.].

     After careful review, I find the ALJ's decision was supported by substantial evidence.

The ALJ properly granted limited weight to the treating physician's opinion, which was

inconsistent with other substantial evidence in the record and unsupported by clinical and

diagnostic evidence.  R. at 26-27.  The ALJ reasonably discredited Faure's testimony about the

severity and functionally limiting effects of her pain and symptoms because it was not

---

    [1] Faure's RFC reflects "the most [she] can still do [in a work setting] despite [her]
limitations."  20 C.F.R. § 404.1545(a).

substantiated by objective medical evidence.  R. at 23-26.  I respectfully recommend Faure's

request for review be DENIED.

## PROCEDURAL HISTORY

On January 29, 2009, Faure applied for DIB alleging disability as of September 5, 2007.

R. at 19, 134-40.  Her application was denied on April 21, 2009, R. at 84-95, and she timely

sought a hearing, R. at 96-97.  Faure was represented by counsel at her hearing on November 10,

2009.  R. at 33-80.  The ALJ heard testimony from Faure and a vocational expert, Sherry Kristal-

Turetzky.  Id.  On February 25, 2010, the ALJ denied Faure's claim.  R. at 16-29.

The ALJ found Faure met the insured status requirements of the Social Security Act

through December 31, 2009,[2] R. at 21, 151, and applied the mandatory five-step sequential

analysis.[3]  At step one, the ALJ found Faure had not engaged in substantial gainful activity since

---

[2] To be eligible for disability benefits under Title II of the Social Security Act, a claimant must show she was insured under the program at the time of the onset of her disability.  Kane v. Heckler, 776 F.2d 1130, 1131 n.1 (3d Cir. 1985); 20 C.F.R. § 404.320(b)(2).

[3] The Social Security Administration has adopted a system of sequential analysis for the evaluation of disability claims, which is codified at 20 C.F.R. § 404.1520.  The steps of the analysis are summarized as follows:

Step One: If the claimant is working, and if the work is substantial gainful activity, the claimant is not disabled.  If the claimant is not working or is not engaging in substantial gainful activity, the analysis proceeds to Step Two.  20 C.F.R. § 404.1520(a)(4)(i).

Step Two: If the claimant has no severe impairment and no severe combination of impairments that significantly limits his physical or mental ability to do basic work activity, the claimant is not disabled.  If there is a severe impairment or severe combination of impairments, the analysis proceeds to Step Three.  20 C.F.R. § 404.1520(a)(4)(ii).

Step Three: If the claimant's impairment meets or equals criteria for a listed impairment or impairments in Appendix 1 to Subpart P of 20 C.F.R. Part 404, the claimant is disabled.  Otherwise, the analysis proceeds to Step Four.  20 C.F.R. § 404.1520(a)(4)(iii).

2

September 5, 2007. R. at 21.  At step two, the ALJ found Faure suffered from several severe

impairments: a cervical sprain and strain disorder, a lumbar sprain and strain disorder, a

dislocated left shoulder disorder after having had a separate surgery on her right shoulder, a knee

pain disorder that followed surgery on her left leg, and a headache disorder. R. at 21-22.  The

ALJ found Faure's learning disorder to be non-severe. R. at 22.  At step three, the ALJ found

none of Faure's impairments, nor any combination thereof, met or medically equaled any of the

Listed Impairments.[4]  R. at 22-23.

  Before proceeding to step four, the ALJ found Faure had the RFC to perform "less than

the full range of light level exertional work."[5]  R. at 23.  The ALJ concluded Faure was:

> [U]nable to push or pull with her left upper or lower extremity, had
> a need to avoid hazards including moving machinery and heights,

---

  Step Four: If the claimant retains the residual functional capacity to perform her past relevant work, the claimant is not disabled.  If the claimant cannot do the kind of work she performed in the past, the analysis proceeds to Step Five. 20 C.F.R. § 404.1520(a)(4)(iv).

  Step Five: If the claimant's residual functional capacity, age, education, and past work experience, considered in conjunction with the criteria listed in Appendix 2 to Subpart P of 20 C.F.R. Part 404, would permit the claimant to adjust to other work, the claimant is not disabled. Otherwise, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v).

  [4] The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 is a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background. Sullivan v. Zebley, 493 U.S. 521, 532 (1990).  The Listing defines impairments that would prevent an adult -- regardless of age, education, or work experience -- from performing any gainful activity, substantial or otherwise. Id.; 20 C.F.R. § 404.1525(a). The Listing was designed to operate as a presumption of disability, making further inquiry unnecessary. Sullivan, 493 U.S. at 532.

  [5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

> unable to climb ladders, ropes or scaffolds, able to climb ramps
> and stairs no more than occasionally, able to balance, stoop, kneel,
> crouch, and crawl no more than occasionally, and unable to
> perform work which requires reading instructions or writing
> reports.

Id.

In determining Faure's RFC, the ALJ reviewed the objective medical evidence, hospital reports, Faure's testimony, and the medical assessment of Faure's treating physician Dr. John Kohler. R. at 23-27. The ALJ assigned limited weight to Dr. Kohler's opinion, finding it was supported by neither clinical nor diagnostic evidence and was inconsistent with other substantial evidence. R. at 26-27. For similar reasons, the ALJ deemed Faure's testimony only partially credible. Id.

At step four, the ALJ determined Faure was unable to perform her past relevant work as a fast food worker or a clerk. R. at 27. At step five, however, the ALJ determined there are a significant number of jobs in the national and regional economy Faure could perform based on her age, education, work experience, and RFC. R. at 28-29. The ALJ found Faure could perform jobs both at a restricted light exertional level, including inspector, ticket taker, and small products assembler, and at the sedentary exertional level,[6] including compact assembler and lamp shade assembler. R. at 27-28.

The Appeals Council denied review on October 21, 2011. R. at 1-3.

---

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

## FACTUAL HISTORY

Faure was twenty-six at the time of the ALJ's decision,[7] R. at 182, with a high school

education, R. at 28.  She had past relevant work experience as a fast food worker and a clerk.[8]  R.

at 27, 154-57, 164.  Faure claimed her disability was a result of cervical and lumbar sprain and

strain causing debilitating pain, left shoulder pain post-dislocation, left knee pain post-surgery,

and chronic headaches, Pl.'s Br. at 3, which have been exacerbated by a string of nine car

accidents from May 1998 through June 15, 2009, see R. at 46, 163, 185-90, 256, 305-08, 348-57.

The objective medical evidence is:

- From March 14, 1998 to March 4, 2004, Faure was treated by Dr. Marvin Gordon

for slight-to-mild pain and tenderness in her neck, back, and shoulders, and for headaches.  See

R. at 214-56.  She underwent regular ultrasounds on her spine.  Id.  Magnetic resonance imaging

("MRI") of Faure's cervical spine and brain in September 2000 was normal.  R. at 228.  Dr.

Gordon observed tenderness and contusions in the lower part of the spine, instability in both

---

[7] Faure is considered a "younger person" under the Commissioner's regulations because she is under age fifty.  See 20 C.F.R. § 404.1563(c).  Age is one of the relevant factors in determining whether a claimant can adjust to other work in the national economy.  Advancing age is "an increasingly limiting factor in [the claimant's] ability to make such an adjustment," 20 C.F.R. § 404.1563(a); however, a younger person's age generally does not seriously impact her ability to adjust to other work, 20 C.F.R. § 404.1563(c).

[8] Faure worked full-time as a cashier at a McDonald's fast food restaurant from 1998 to 1999 and as a clerk at a rehabilitation center from 2005 to September 5, 2007.  R. at 164.  On that date she claimed at one point that her condition prevented her from working, see R. at 134, 163, but at another point, she claimed that she had been laid off from work, see R. at 41, 164, 336.

shoulders, and tendinitis[9] and adhesive capsulitis[10] in the right shoulder. See, e.g., R. at 232-34. She was diagnosed with muscle spasms in the cervical and thoracic spine with restricted motion and a disk bulge.[11] See R. at 227, 230. She was prescribed several pain medications. R. at 223.

- On May 5, 1998, Faure was injured in a car accident, see R. at 208-13, 256, but a May 13, 1998 x-ray of her cervical spine was normal, R. at 239.

- From July 31, 1998 to October 14, 1998, Faure was treated at Mercer-Bucks Rehabilitation for a cervical sprain and strain. See R. at 185-90. Faure complained of a constant, sharp pain in both sides of her neck and stiffness, id., but her condition improved after physical therapy, see R. at 185-86 (noting Faure could sit longer and sleep better than she could when she began treatment).

- On December 17, 1998, Faure sought treatment from Dr. Joseph Maio, complaining of spasms, stiffness, and stabbing pain in her neck and shoulders. R. at 209. Faure reported difficulty sleeping, headaches, and an upset stomach since the May 5, 1998 accident. R. at 210. She also reported that routine activities such as lying down, sitting, standing, walking, working, lifting, bending, pulling, and reaching were either uncomfortable or painful. Id. Dr.

---

[9] Tendinitis is the inflammation of tendons and tendon-muscle attachments and causes pain or tenderness near a joint. See Dorland's Illustrated Medical Dictionary 1881 (32nd ed. 2012) [hereinafter Dorland's]; U.S. Nat'l Libr. of Med., Tendinitis, Medline Plus, http://www.nlm.nih.gov/medlineplus/tendinitis.html (last visited Aug. 15, 2012).

[10] Adhesive capsulitis is an inflammation between the joint and the cartilage of the shoulder, characterized by shoulder pain of gradual onset, with increasing pain, stiffness, and limitation of motion. See Dorland's at 286.

[11] A bulging or herniated disk occurs when the soft, jelly-like substance between the twenty-six vertebrae in the spine slips out of place or ruptures, causing back pain or sciatica if it presses on a nerve. U.S. Nat'l Libr. of Med., Herniated Disk, Medline Plus, http://www.nlm.nih.gov/medlineplus/herniateddisk.html (last visited Aug. 15, 2012).

Maio noted a decreased range of motion in Faure's cervical spine, pain and spasm, a cervical compression, pain in her neck and across the shoulders, palpable trigger nodules,[12] and the presence of jump sign and muscle twitch.[13] R. at 207-08. Weekly treatments continued with Dr. Maio until April 19, 1999. See R. at 191, 207.

• From October 28, 2002 to March 22, 2004, Dr. Mark Lazarus treated Faure at the Rothman Institute for Orthopaedics for pain in her shoulders. See R. at 257-68. Dr. Lazarus operated on Faure's right shoulder on February 27, 2003, R. at 264-65, which resulted in decreased pain and increased range of motion and rotation, see R. at 261-62. Dr. Lazarus also administered a subscapular injection of lidocaine[14] and Kenalog[15] in her left shoulder on February 2, 2004. R. at 258. All medical imaging tests were normal. See R. at 257-68.

• On June 15, 2005, Faure had surgery on her left knee. R. at 469. Despite normal MRI results, Faure's surgeon found "a lot" of scar tissue. Id.

• Dr. Kohler treated Faure since she was sixteen years old. Between January 3, 2007 and October 14, 2009, he administered pain management therapy, and attempted to improve Faure's range of motion and function. See R. at 316-46, 370-465, 469. Dr. Kohler

---

[12] Trigger nodules, or trigger points, are small, painful growths that can cause pain. U.S. Nat'l Libr. of Med., Bruxism, Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/001413.htm (last visited Aug. 15, 2012).

[13] Muscle twitching is fine movements of a small area of muscle with a number of causes, including exercise, stress, nerve damage, muscular dystrophy, spinal muscular atrophy, or weak muscles. U.S. Nat'l Libr. of Med., Muscle Twitching, Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/003296.htm (last visited Aug. 15, 2012).

[14] Lidocaine is a drug having anesthetic, sedative, analgesic, anticonvulsant, and cardiac depressant activities and is used as a local anesthetic. Dorland's at 1034.

[15] Kenalog is a trademark for preparations of triamcinolone acetonide, which is administered as an anti-inflammatory and immunosuppressant. See Dorland's at 978, 1959.

noted mild-to-moderate spasms, sprains, and strains in several different muscle groups as well as the presence of trigger points. Id. Dr. Kohler observed on many occasions that Faure had mild, little, or no difficulty getting on and off the examination table, and that she had a "relatively normal gait." R. at 316-18, 320-25, 329-30, 332, 335-40, 342, 345-46, 372-80, 384-97, 400-11, 421-28, 430, 435-36, 440-41, 444, 447, 450-56, 458-65. Other times, she "walked with a slow, stiff, and very painful gait" and had "considerable difficulty" getting on and off the examination table. R. at 325, 329, 335, 338, 377, 408, 435-36, 438, 447.

• An August 29, 2007 MRI of Faure's left knee was normal. R. at 271. On September 7, 2007, Faure sought treatment at St. Mary Medical Center, complaining of left leg pain. See R. at 269-71. Diagnostic imaging of her legs revealed no abnormalities. R. at 270.

• From February 7, 2008 to April 29, 2008, Faure underwent aquatic physical therapy for left knee sprain, strain, and instability. See, e.g., R. at 272-303. Faure reported that her knee was "sore"; that she had difficulty with weight-bearing activities, squatting, and kneeling; that she experienced episodes of her knee giving out, frequent "popping," and loss of balance; that her knee felt "fatigued"; and that her sleep was disturbed. Id. After nineteen sessions, Faure's treating physical therapist reported Faure had shown poor progress, that her range of motion and strength had not improved, and that she still complained of moderate pain. Id. The physical therapist also stated Faure continued to have limitations with overall functional mobility, and recommended further physical therapy. Id.

• On March 23, 2009, Faure was in another car accident.[16] R. at 305-06. Her

---

[16] Faure was seatbelted in the driver's seat and was not moving when her car was rear ended by another car moving at zero-to-five miles per hour. R at 306. The airbags did not deploy. Id.

physical examination at St. Mary Medical Center's Emergency Department revealed a normal range of motion in her neck and legs with only slight tenderness in her neck and lower spine. R. at 306. Faure had no pain in her clavicle, shoulder, elbow, wrist, hand, fingers, hip, knees, or ankles, and no pain walking or lifting. Id. Medical imaging of Faure's spine revealed no fractures or dislocation, and Faure was instructed to take Motrin for her pain. R. at 307.

• On April 21, 2009, Rachel Vogel, a state agency disability claims examiner, performed a physical assessment of Faure. R. at 309-15. She found Faure could: lift or carry twenty pounds occasionally and ten pounds frequently; stand and walk with normal breaks for six hours in an eight-hour work day and had unlimited ability to push or pull; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and never climb ladders, ropes, or scaffolds. R. at 310-11. Vogel reported Faure's daily activities were not significantly limited, that Faure was not undergoing physical therapy at the time of the assessment, and that Faure had no alleged side effects from her prescribed medications. See R. at 314-15. Based on Faure's medical history, the character of her symptoms, her activities of daily living, and the type of treatment she received, Vogel found Faure's statements about her symptoms and their effects to be only partially credible. Id.

• On June 15, 2009, Faure was once again involved in a car accident.[17] See R. at 348-57. An EMS report stated Faure's back, chest, head, legs, arms, and neck were assessed with no abnormalities. R. at 351, 355. She was treated at the Abington Memorial Hospital Emergency Center and complained only of abdominal discomfort and pain around the seatbelt

---

[17] The EMS report noted Faure was seated in the driver's seat and was wearing her seatbelt when the side mirror was struck by another car's side mirror at a low rate of speed, and that "the only damage to the whole vehicle was the driver's side mirror was hanging out of [its] casing." R. at 351-52, 355.

9

areas. R. at 348. She had full range of motion in her arms, legs, and spine. Id. Faure was

diagnosed with muscle sprains and strains related to a motor vehicle accident and directed to take

acetaminophen for the pain. R. at 348-49.

•   At a November 10, 2009 ALJ hearing, Faure complained of shoulder, neck, ankle,

knee, and back pain, as well as severe headaches. See R at 34-80. She testified that her knee

gives out, causing instability, that she cannot lift more than twenty pounds, and that she cannot

do much carrying with her left shoulder. See id. She further testified she could not work because

she could not sit for more than forty minutes without changing positions, and she could stand in

one spot for no more than twenty minutes at a time or an hour in an eight-hour work day. R. at

41-44. Faure said she could walk one-and-a-half city blocks, R. at 45-46, that she had good days

and bad days, and was able to do basic household chores including loading the dishwasher,

crocheting, and light loads of laundry with frequent breaks. See R. at 66-69. She claimed the car

accidents in 2009 significantly worsened her impairments. See R. at 55-62.

•   In a November 12, 2009 Medical Source Statement, Dr. Kohler diagnosed Faure

with low back pain, migraine headaches, flank pain, cervical and lumbar sprain and strain,

lumbar disc disease with bulging disc, left knee pain after injury, left knee instability, right

shoulder pain, left shoulder pain with instability, and severe insomnia. R. at 468. Dr. Kohler

noted Faure usually had normal range of motion in her lower back and adequate range of motion

in her neck except when her pain level increased. See R. at 469. He also acknowledged that an

MRI of Faure's left knee was normal. Id. After summarily noting Faure's impairments were

reasonably consistent with the symptoms and functional limitations he described, Dr. Kohler

opined Faure would face the following physical limitations in a working environment:

10

- Faure's experience of pain or other symptoms is severe enough to interfere with attention and concentration "often," or about two-to-three times a week.  R. at 470.

- Faure's ability to deal with work stress is slightly limited.  Id.

- Faure can walk one-half-to-one city block without stopping for rest.  Id.

- Faure can continuously sit for two hours at one time and can continuously stand for thirty minutes at a time.  R. at 471.

- Faure can sit for about four hours and can stand or walk less than two hours in an eight-hour work day.  Id.

- Faure will need a job which permits shifting positions at will among sitting, standing, or walking, and will need to take one, fifteen-minute unscheduled break an hour during an eight-hour work day.  Id.

- Faure's legs should be elevated "straight out" seventy percent of the time in an eight-hour work day with prolonged sitting.  Id.

- Faure can use only her fingers for fine manipulations about "six percent" of the time in an eight-hour working day and she cannot use her arms or hands for repetitive tasks. R. at 472.

- Faure would be unable to bend or twist at the waist for any amount of time in an eight-hour work day. Id.

- Faure's impairments would produce "good days" and "bad days," causing her to be absent from work about eight-to-ten times a month.  Id.

## DISCUSSION

I.      Legal Standard

I must determine whether substantial evidence supports the Commissioner's final decision.  42 U.S.C. § 405(g); Smith v. Comm'r of Soc. Sec., 631 F.3d 632, 633 (3d Cir. 2010); Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005).  The factual findings of the Commissioner must be accepted as conclusive if they are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 390 (1971) (citing 42 U.S.C. § 405(g)); Smith, 631 F.3d at 634; Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 503 (3d Cir. 2009); Rutherford, 399 F.3d at 552.  "Substantial evidence is 'more than a mere scintilla.'"  Diaz, 577 F.3d at 503 (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)); see also Smith, 631 F.3d at 633.  It is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson, 402 U.S. at 401 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Smith, 631 F.3d at 633; Diaz, 577 F.3d at 503.

I may not weigh evidence or substitute my own conclusion for that of the ALJ.  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  I must defer to the ALJ's evaluation of evidence, assessment of the credibility of witnesses, and reconciliation of conflicting expert opinions. Diaz, 577 F.3d at 506.  If the ALJ's findings of fact are supported by substantial evidence, I am bound by those findings, even if I would have decided the factual inquiry differently.  Fargnoli v. Massanari, 247 F.3d 34, 38 (3d. Cir. 2001).  At the same time, however, I must remain mindful that "'leniency [should] be shown in establishing claimant's disability.'"  Reefer v. Barnhart, 326 F.3d 376, 379 (3d Cir. 2003) (quoting Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979)).

In addition, I retain "plenary review over the ALJ's applications of legal principles." Payton v. Barnhart, 416 F. Supp. 2d 385, 387 (E.D. Pa. 2006) (citing Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995)). Thus, I can overturn an ALJ's decision based on an incorrect legal standard even if I find it was supported by substantial evidence. Id. (citing Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983)).

A claimant is disabled if she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505; Smith, 631 F.3d at 634; Diaz, 577 F.3d at 503. The claimant satisfies her burden by showing an inability to return to her past relevant work. Rutherford, 399 F.3d at 551; Plummer, 186 F.3d at 428. Once this showing is made, the burden shifts to the Commissioner to show the claimant, given her age, education, and work experience, has the ability to perform specific jobs existing in the economy. 20 C.F.R. § 404.1520(a)(4)(v); Smith, 631 F.3d at 634; Rutherford, 399 F.3d at 551.

The ALJ may not make speculative inferences from medical evidence, see, e.g., Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981), but may reject conflicting medical evidence. Williams v. Sullivan, 970 F.2d 1178, 1187 (3d Cir. 1992). When a conflict in the evidence exists, the ALJ may choose whom to credit, but "'cannot reject evidence for no reason or for the wrong reason.'" Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993) (quoting Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981)); accord Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). The ALJ must state more than ultimate factual conclusions to support her findings. Hargenrader v. Califano, 575 F.2d 434, 437 (3d Cir. 1978). The ALJ must consider all the evidence and give

13

some reason for discounting the evidence she rejects.  See Stewart v. Sec'y of HEW, 714 F.2d 287, 290 (3d Cir. 1983).

II.    Faure's Arguments

    A.    Treating Physician's Opinion

Faure claims the ALJ's conclusion was not supported by substantial evidence because the ALJ failed to give proper weight to Dr. Kohler's opinion.  Pl.'s Br. at 4.  I disagree.  The ALJ found Dr. Kohler's assessment was inconsistent with other substantial evidence and was unsupported by clinical or diagnostic evidence.  R. at 26-27.  The ALJ properly explained the evidence supporting her findings and the reasons for discounting the rejected evidence.  Diaz, 577 F.3d at 505-06; Cotter, 642 F.2d at 705-06.  This allows me to conclude significant probative evidence was properly rejected and was not ignored.  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000); Cotter, 642 F.2d at 706-07.

A treating source's opinion is entitled to controlling weight when it is supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record.[18]  See 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996).  A treating source's opinion may be rejected "on the basis of contradictory medical evidence," Plummer, 186 F.3d at 429, or if unsupported by sufficient clinical data, Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985).  The opinion may be accorded "more or less weight depending upon the extent to which supporting explanations are

---

[18]  A treating source is a "physician, psychologist, or other acceptable medical source" who provides a patient with "medical treatment or evaluation," and has an "ongoing treatment relationship" with the patient.  20 C.F.R. § 404.1502.  A medical source may be considered a treating source where the claimant see the source "with a frequency consistent with accepted medical practice for the type of treatment . . . required for [the claimant's] condition(s)."  Id.

14

provided." Plummer, 186 F.3d at 429 (citing Newhouse, 753 F.2d at 286).  Where a treating

source's opinion is not given controlling weight, the ALJ must determine what weight to give the

relevant medical sources by considering factors such as the length of the treatment relationship

and frequency of visits, nature and extent of the treatment relationship, whether the medical

source supports the opinion with medical evidence, whether the opinion is consistent with the

medical record, and the medical source's specialization.  20 C.F.R. § 404.1527(c).  An ALJ may

not make "speculative inferences from medical reports" and may not reject a treating physician's

opinion "due to his or her own credibility judgments, speculation or lay opinion."  Morales, 225

F.3d at 317.  The ALJ may not ignore medical evidence in favor of his own conclusions.  Van

Horn v. Schweiker, 717 F.2d 871, 874 (3d Cir. 1983).

    First, the ALJ concluded Dr. Kohler based his assessment almost entirely on Faure's

assertions and complaints.  R. at 27.  For example, Dr. Kohler's physical examination

impressions and diagnoses consistently noted Faure reported both good days and bad days as a

result of her impairments.  R. at 472.  He noted Faure frequently had no difficulty or only "mild

difficulty" getting on and off the examination table or moving her head, and that she had a

"relatively normal gait."  R. at 316-18, 320-25, 329-30, 332, 335-40, 342, 345-46, 372-80, 384-

97, 400-11, 421-28, 430, 435-36, 440-41, 444, 447, 450-56, 458-65.  Dr. Kohler rarely observed

more severe symptoms.  See R. at 325, 329, 335, 338, 377, 408, 435-36, 438, 447.  Such

evidence justifies the ALJ's finding that Dr. Kohler's treatment records failed to support the

extreme limitations he later proposed.

    The ALJ also rejected Dr. Kohler's opinion as inconsistent with his physical

examinations of Faure, his professional impressions of those examinations, and his own

treatment plan. R. at 27. Dr. Kohler acknowledged Faure's range of motion was usually "adequate" or "normal" and she "sometimes" has evidence of instability, R. at 469, which was consistent with his physical evaluations, see, e.g., R. at 386, 388, 393, 434, 438. Throughout his notes, Dr. Kohler also noted that acupuncture treatment relieved Faure's pain. See R. at 316-46, 370-465, 469. Although Vogel was not a treating source, the ALJ recognized that Vogel's notes on Faure's medically determinable impairments were consistent with Dr. Kohler's observations and diagnoses, and were accounted for in Vogel's assessment of Faure's RFC. See R. at 309-15.

Next, the ALJ found the record lacked any documented medical evidence of significant physical impairments that limited Faure's ability to lift, carry, walk, sit, or perform postural activities to the degree Dr. Kohler claimed. R. at 27. Although the observations of the physicians and therapists who treated Faure in the past support some of Dr. Kohler's observations and diagnoses, multiple MRIs and other diagnostic imaging over several years repeatedly revealed no physical abnormalities. See, e.g., R. at 187-90, 214-56, 228-29, 232-34, 239, 257-71, 305-06, 308, 348-52, 469. The ALJ properly weighed the testing results in evaluating Dr. Kohler's opinion, and explained her rationale.

The ALJ found Dr. Kohler's assessment was not supported by reports establishing only "routine, conservative, outpatient care." R. at 27. Although Faure has undergone multiple surgeries, they have successfully relieved her symptoms and treated the underlying medical conditions. For example, Dr. Lazarus performed surgery on Faure's right shoulder in February 2003, see R. at 264-65, noting: (1) Faure's shoulder was "completely stable"; (2) Faure was "comfortable" after the procedure; and (3) she was able to perform home exercises without difficulty or instability, see R. at 260-63. Similarly, Dr. Lazarus treated Faure's left shoulder

16

condition with an outpatient procedure that provided a "fairly significant benefit." See R. at 257-59. After Faure's arthroscopic surgery on her left knee in June 2005, R. at 469, diagnostic imaging and assessments of the leg yielded normal results, see R. at 269-71, 351. Dr. Kohler frequently acknowledged that the acupuncture treatment he administered to Faure helped her recover from many of her past accidents and relieved her pain, improved her range of motion, and improved her ability to function. See R. at 316-46, 370-465, 469.

Finally, the ALJ determined Dr. Kohler's opinion was inconsistent with Faure's self-reported activities of daily living. R. at 27. Faure told Dr. Kohler that walking to and from the parking lot at a Phillies game bothered her, that the plastic seats aggravated her back, and that climbing steps aggravated her left knee. See R. at 377, 381, 382. She said she was able to walk around a carnival for only an hour before stopping because of the pain. R. at 376. Such limitations are accounted for in the ALJ's RFC determination.[19] Dr. Kohler's evaluation of the degree to which Faure's condition restricted her ability to perform tasks in an eight-hour work day was inconsistent with Faure's acknowledgment that she could shop for groceries, run errands, go to fairs, see movies, work part-time at a library snack bar, attend parties, take a community college computer class, fill in for other employees when she was employed, do household chores, bake, help her friend with a college essay, go to the mall, socialize with friends, and babysit. R. at 316, 320-21, 323-25, 332, 374, 377-89, 392-95, 400, 410-12, 414-17, 421-22, 441-47, 451, 457, 459-65.

---

[19] The ALJ determined that Faure was "unable to push or pull with her upper or lower extremity, had a need to avoid hazards including moving machinery and heights, was unable to climb ladders, ropes, or scaffolds, was able to climb ramps and stairs no more than occasionally, was able to balance, stoop, kneel, crouch, and crawl no more than occasionally, and was unable to perform work which requires reading instructions or writing reports." R. at 23.

Although Faure debates the merits of the ALJ's conclusion, the ALJ weighed conflicting medical evidence and provided valid reasons for giving limited weight to Dr. Kohler's opinion. See Burnett, 220 F.2d at 112; Cotter, 642 F.2d at 700.

B.      Credibility

Faure also alleges the ALJ erred in rejecting her testimony. See Pl.'s Br. at 14-17. After comparing Faure's testimony with the objective medical evidence, the ALJ properly discredited Faure's claims about the severity of her pain and symptoms and their impact on her ability to work. See R. at 23-26.

A credibility finding merits deference based on the ALJ's ability to observe the claimant's demeanor. See Reefer, 326 F.3d at 380; see also Bembery v. Barnhart, 142 F. App'x 588, 591 (3d Cir. 2005). I must nevertheless exercise meaningful review. See Cao v. United States, 407 F.3d 146, 152 (3d Cir. 2005). When making credibility findings, the ALJ must communicate with the claimant to fully understand her impairments and their impact on her ability to work. See Reefer, 326 F.3d at 380. For example, the ALJ may ask the claimant "to describe [her] pain, [her] daily activities and limitations, how much [she] can lift, how far [she] can walk, how long [she] can sit or stand without discomfort, or whether [she] has difficulty concentrating." See id. The reasons supporting credibility findings must be substantial and bear a legitimate nexus to the findings as demonstrated by inconsistent statements, contradictory evidence, or inherently improbable testimony. Id.; accord St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d Cir. 2005) (credibility determinations should not be reversed unless "inherently incredible or patently unreasonable" as long as the ALJ considers all relevant factors and explains her decisions). When a conflict in evidence exists, the ALJ may choose whom to credit, but "cannot

18

reject evidence for no reason or the wrong reason." See Mason, 994 F.2d at 1067 (citing Cotter, 642 F.2d at 707). If supported by substantial evidence, the ALJ's credibility findings may not be disturbed on appeal. Hirschfield v. Apfel, 159 F. Supp. 2d 802, 811 (E.D. Pa. 2001).

Although the ALJ must carefully consider a claimant's subjective complaints of pain and limitations, "the ALJ is not required to credit them." Chandler, 667 F.3d at 363. An ALJ may discredit a claimant's complaint of pain when: (1) there is contrary medical evidence in the record; and (2) the ALJ explains the basis for rejecting the complaints. Mason, 994 F.2d at 1067. Other factors relevant to evaluating subjective complaints of pain include: daily activities; "the location, duration, frequency, and intensity of . . . pain or other symptoms"; "precipitating and aggravating factors"; "the type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms"; "treatment, other than medication, . . . received for relief . . . of pain or other symptoms"; "any measures . . . used to relieve . . . pain or other symptoms"; and "other factors concerning . . . functional limitations and restrictions due to pain or symptoms." 20 C.F.R. § 404.1529(c)(3).

After carefully reviewing the medical evidence and observing Faure testify, the ALJ concluded "that there are inconsistencies in the record which do not reflect well on the totality of the claimant's allegations." R. at 24. The ALJ then documented her concerns with multiple cites to conflicting evidence. See R. at 24-25. Combined with her ability to observe Faure, the ALJ's detailed explanation of her rationale merits deference.

For example, the ALJ correctly noted the record lacked evidence establishing Faure required any critical active treatment or significant outpatient care other than "routine medical monitorization [sic] and maintenance." See R. at 25-26. Nor did Faure offer any evidence to

19

substantiate symptoms as severe as she described, and her doctors documented no signs of such substantial physical limitation. See id. Similarly, the ALJ noted, the record revealed no physical impairment which would adversely affect Faure's ability to "lift, carry, stand, walk, or sit to the degree as asserted," and that the record revealed "no notable evidence of underlying anatomical or physiological conditions that can reasonably be expected to produce the level of pain as described." Id. Rather, as the ALJ explained, the record established that medical monitoring and the use of prescribed medications kept Faure's impairments and their related symptoms under "relatively" good control, and that Faure's self-reported activities of daily living were inconsistent with her assertions of inability to perform physical activities. See id. Faure does not claim the ALJ ignored any specific limitation that she described in her testimony.

This is not a case, as Faure suggests, in which the ALJ improperly concluded the mere "ability to do intermittent household chores" established the ability to work. See Pl.'s Br. at 16 (citing Frankenfield v. Bowen, 861 F.2d 405, 405 (3d. Cir. 1988); Califano, 637 F.2d at 971). Instead, the ALJ correctly examined the totality of Faure's history, and her level of activity, to conclude her limitations were exaggerated. This, of course, is the critical function the ALJ must perform as fact-finder. The ALJ's credibility finding was supported by substantial evidence and merits deference.

Accordingly, I make the following:

# RECOMMENDATION

AND NOW, this sixteenth day of August, 2012, it is respectfully recommended that

Faure's request for review be DENIED and judgment be entered for the Commissioner. Faure

may file objections to this Report and Recommendation within fourteen days after being served

with a copy thereof. <u>See</u> Fed. R. Civ. P. 72. Failure to file timely objections may constitute a

waiver of any appellate rights. <u>See</u> <u>Leyva v. Williams</u>, 504 F.3d 357, 364 (3d Cir. 2007). .

BY THE COURT:

TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE

21